IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| KENNETH L. DIXON, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>COMMISSIONER OF SOCIAL )<br>SECURITY, )<br>)<br>Defendant. ) | Case No. 3:04-cv-266-DGW |

**ORDER**

This matter is before the court on the Complaint for Disability Insurance Benefits ("DIB") filed by the Plaintiff, Kenneth L. Dixon, on April 20, 2004 (Doc. 1). For the reasons set forth below, the Final Decision of the Commissioner denying benefits is **AFFIRMED** and this matter is **DISMISSED WITH PREJUDICE**.

### BACKGROUND

**Procedural History**

Plaintiff filed a DIB application on June 28, 2000, alleging that he became unable to work on November 15, 1998 due to back surgeries, knee surgery, foot numbness, and back pain (Tr. 25, 82, 101, 118, 123). His application was denied initially, on reconsideration (Tr. 40, 45), and by an Administrative Law Judge ("ALJ") after a hearing at which the plaintiff, who was represented by an attorney, and a VE testified (Tr. 20, 380). The ALJ's decision became the final decision of the agency when the Appeals Council denied review of that decision on February 27, 2004 (Tr. 5).

**Medical History**

The plaintiff, Kenneth L. Dixon, was 43 years old at the time of the agency's final decision in this case (Tr. 20, 82). He completed the eighth grade in school and has worked as a

welder (Tr. 102, 107, 110, 124).  The Plaintiff's general medical problems include back pain, knee pain, foot pain, and depression.  The Plaintiff's problems appear to have developed when he fell at work in June, 1998.  As noted below, the Plaintiff was examined by a variety of doctors.

The Plaintiff underwent left knee arthroscopic surgery on January 5, 1999 (Tr. 183-184).  On January 27, 1999, the Plaintiff told the physician that his knee was feeling much better, it had a full range of motion, and strength was excellent (Tr. 211).  The Plaintiff nonetheless had burning pain in the foot and, because of that, Dr. J. Wood recommended that the Plaintiff stay off work for 4 weeks (Tr. 211).  On February 24, 1999, there was full motion of the knee, the knee looked "quite good," and strength was good (Tr. 210).  Dr. Wood recommended no work for 4 weeks (Tr. 210).  A February 26, 1999 EMG studies showed denervation at left S1 and the possibility of "very mild" left neuropathy (Tr. 373).

On March 22, 1999, Dr. Wood noted that the Plaintiff's EMG studies showed improvement of the perineal neuropathy and that there was L1-S1 neuropathy (Tr. 208).  An examination showed mild weakness while standing on the left foot and good left knee motion (Tr. 208).  A March 24, 1999 lumbar MRI showed encroachment of the left side of the left canal and left neural foramina at L5-S1, some displacement of nerve roots at this level, moderate spinal canal and neural foraminal stenosis at L4-5 due to degenerative disc bulge, and narrowing of the left neural foramina (Tr. 213).

Dr. Theo Mellion examined the Plaintiff for the first time on April 9, 1999 (Tr. 197).  The Plaintiff had a gunshot wound to the spine 22 years ago (Tr. 197).  There was somewhat limited mobility of the spine, motor strength was full in all muscle groups tested, and the Plaintiff could

walk on his heels and toes (Tr. 198).  There was decreased sensation distribution on the left at the L5- S1 level, reflexes were absent or reduced in the lower extremities, and left straight leg raising was 45 degrees (90 is normal) (Tr. 198).  The Plaintiff did not have "right-sided symptoms" and he did not complain of low back pain (Tr. 197).

Dr. S. Gibbs examined the Plaintiff on April 23, 1999 (Tr. 257).  The Plaintiff complained of left knee pain, but he specifically denied any significant back pain (Tr. 257). Strength in all extremities was normal and there was no atrophy, sensation was abnormal in the left lower extremity, and reflexes in the extremities were reduced or absent (Tr. 258-59).  The Plaintiff had a normal gait and station, spinal motion was normal, and there were no spasms (Tr. 259).  A May 7, 1999 lumbar CT scan showed bullet fragments at L5 on the left, partial encroachment into the left neural foramina at L5-S1 disc space, spinal stenosis at L4 and L5 due to some disc bulging and facet hypertrophy, and no definite evidence of herniation of nucleus pulposus (Tr. 200).  The Plaintiff underwent lumbar surgery on May 18, 1999, because of a herniated disc at L4-5 (Tr. 187-92).

Dr. Mellion saw the Plaintiff again on June 17, 1999 (Tr. 195).  Notwithstanding the surgery, the physician noted that the Plaintiff was not doing well (Tr. 195).  Dr. Mellion recommended non-surgical treatment, physical therapy, heat treatment, and aquatherapy, among others (Tr. 195).  Dr. Mellion also saw the Plaintiff on July 1, 1999 (Tr. 193).  The Plaintiff complained of continued low back pain radiating down the left leg (Tr. 193). The Plaintiff still had a large bullet fragment lodged in his spine that Dr. Mellion believed was causing his problems even though he was asymptomatic for twenty years (Tr. 193). Dr. Mellion recommended non-surgical treatment, pain-management program; however, he indicated that

further surgery is an option (Tr. 193).

On July 14, 1999, Dr. Wood found full left knee motion, excellent strength, and decreased sensation in the bottom of the left foot (Tr. 206). Dr. Wood released the Plaintiff with no significant restrictions (Tr. 206).

Dr. Gibbs examined the Plaintiff on July 21, 1999 (Tr. 254). Strength in the extremities was normal and there was no atrophy, sensation was normal except at the left knee and foot, and reflexes in the extremities were absent or reduced (Tr. 255). The Plaintiff had a slightly antalgic gait on the left (Tr. 255). An August 3, 1999 lumbar MRI showed moderate stenosis of the spinal canal at L4-5 with neural foraminal narrowing (Tr. 263). There was also disc bulging at L5-S1 which intrudes into the proximal potion of the foramen (Tr. 263). On August 11, 1999, Dr. Gibbs found normal strength and no atrophy in the lower extremities, abnormal sensation in the left leg and foot, reduced reflexes in the lower extremities, and a slightly antalgic gait on the left (Tr. 252). The Plaintiff underwent bilateral L4, L5, and S1 laminectomy, and facetectomy and foraminotomy on September 2, 1999 (Tr. 218-25). A September 3, 1999 lumbar spine x-rays showed bullet fragments near L5 and L4-5 disc space narrowing (Tr. 227).

Dr. S. Jordan performed a psychological evaluation of the Plaintiff on October 15, 1999 (Tr. 235). Dr. Jordan diagnosed a pain disorder associated with medical and psychological factors, and an adjustment disorder with depressed mood (Tr. 235). Dr. Jordan assigned the Plaintiff a Global Assessment of Functioning ("GAF") score of 55 (Tr. 235).

In October, November, and December 1999, Dr. Gibbs found normal strength and no atrophy in the extremities, abnormal sensation in the left lower extremity, decreased reflexes in the lower extremities, and a normal gait (Tr. 245-46, 248-50). A December 10, 1999 Lumbar

4

MRI showed degenerative changes at L4-5 and at L5-S1 on the left, disc bulge at L4-5 with no herniation, disc bulge at L5-S1 that narrows the neural foramen, and moderate spinal stenosis at L4-5, with no disc protrusion or herniation (Tr. 244). On January 26, 2000, Dr. Gibbs found normal strength and no atrophy in the extremities, abnormal sensation in the left lower extremity, reduced reflexes in the lower extremities, and a normal gait (Tr. 242).

Dr. D. Lange examined the Plaintiff on March 27, 2000 (Tr. 271). Dr. Lange found normal neurological findings except for a depressed left ankle jerk (Tr. 272). Bilateral straight leg raising was normal, and the Plaintiff complained of discomfort with range of motion testing (Tr. 272). Dr. Lange concluded that the Plaintiff should seek employment in a less demanding occupation than his previous labor intensive job (Tr. 274).

Dr. Lange saw the Plaintiff again on May 9, 2000 (Tr. 269). Bilateral straight leg raising was normal, left ankle jerk was depressed, and there was decreased sensation in the left calf (Tr. 269). Dr. Lange concluded that the Plaintiff was not disabled (Tr. 270). Based on a July 27, 2000 examination, Dr. J. Zang, an internist–pediatrics, responded to a questionnaire from the State Agency (Tr. 275). There was decreased sensation in the left leg, decreased reflexes in the legs, no atrophy, and the Plaintiff walked with a limp on the left (Tr. 275). Lumbar motion was very decreased (Tr. 276). After that one examination, Dr. Zang opined that the Plaintiff could not sit or stand more than 30 minutes, lift more than 20 pounds, or bend to lift (Tr. 276).

In August and September 2000, state agency physicians reviewed the Plaintiff's medical record and they assessed his ability to work (Tr. 167-74). The Plaintiff could occasionally lift/carry up to 20 pounds, frequently lift/carry up to 10 pounds, and stand, walk, or sit 6 hours (T. 168). The Plaintiff could occasionally stoop and crouch (Tr. 169).

The Plaintiff underwent emergency room treatment on October 21, 2000 because of back pain (Tr. 347). Reflexes in the lower extremities were depressed, but sensation was intact (Tr. 348). Lumbar x-rays showed degenerative changes most pronounced at L4-5 and L5-S1 (Tr. 351). On November 2, 2000, Dr. Zang opined that the Plaintiff was disabled (Tr. 279).

Dr. R. Leung examined the Plaintiff on January 17, 2001 (Tr. 282). The Plaintiff could not heel or toe walk, he could squat one-half way, and he had a slow gait with a moderate limp (Tr. 284). He had no difficulty getting on and off the examining table (Tr. 284). Strength in the upper extremities was slightly reduced, and there was no atrophy or sensory deficits (Tr. 284). Reflexes could not be elicited (Tr. 284). There was decreased motion of the left shoulder, neck, and lumbar spine (Tr. 286-87).

Dr. J. Clark examined the Plaintiff on March 19, 2001 (Tr. 325). Strength in the lower extremities was normal, sensation was intact, reflexes in the lower extremities were reduced, and the Plaintiff walked unassisted (Tr. 325). In April 2001, Dr. Zang opined that the Plaintiff was disabled (Tr. 289). The Plaintiff underwent diagnostic testing on April 9, 2001 (Tr. 329). Lumbar spine MRI showed postoperative changes at L4-5 with degenerative change, and diffuse bulging disc at L4-5 resulting in moderate central canal stenosis (Tr. 330).

Dr. W. Tung saw the Plaintiff on April 9, and May 21, 2001 (Tr. 321, 323). There was slight weakness in the left lower extremity, decreased sensation in the L4-5 level, and reduced reflexes in the lower extremities (Tr. 321). The Plaintiff had a steady gait and could tandem walk (Tr. 321). An examination on July 16, 2001 showed right straight leg raising at 45 degrees, no focal neurological deficits, and decreased sensation in the L1 and L5 dermatomes (Tr. 338).

**Vocational Expert Testimony**

Dr. J. Bordieri testified at the administrative hearing as a VE (Tr. 401). The ALJ asked the VE a hypothetical question regarding what jobs an individual like the Plaintiff (with his age, education and vocational history) could perform assuming he could lift and or carry up to 10 pounds frequently and 20 pounds occasionally; have a sit stand option; never climb ladders, ropes, or scaffolding; occasionally climb stairs and ramps, stoop, kneel, crouch and crawl; do activities that are restricted to simple one and two step work processes, not an assembly line pace; and not do work that required reading or writing (Tr. 402). Dr. Bordieri replied that such a person like the Plaintiff could perform more than 30,000 jobs in a 200 mile radius surrounding Carbondale, Illinois as a security guard, surveillance monitor, cashier, and gate keeper (Tr. 403). The VE also testified that his testimony conformed with information in the Dictionary of Occupational Titles (Tr. 404).

## DISCUSSION

To receive disability benefits or supplemental security income, a claimant must be "disabled." A disabled person is one whose physical or mental impairments result from anatomical, physiological, or psychological abnormalities which can be demonstrated by medically acceptable clinical and laboratory diagnostic techniques and which prevent the person from performing previous work and any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(A), 1382c(a)(3)(B), 1382c(a)(3)(D).

The Social Security regulations provide for a five-step sequential inquiry that must be followed in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920. The

Commissioner must determine in sequence: (1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets or equals one listed by the Commissioner, (4) whether the claimant can perform his or her past work, and (5) whether the claimant is capable of performing any work in the national economy. Clifford v. Apfel, 227 F.3d 863, 868 (7th Cir. 2000). If the claimant does not have a listed impairment but cannot perform his or her past work, the burden shifts to the Commissioner at Step 5 to show that the claimant can perform some other job. Id.

Under the Social Security Act, a court must affirm the Commissioner's findings if they are supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla" of proof. The standard is satisfied by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971); Butera v. Apfel, 173 F.3d 1049, 1055 (7th Cir. 1999). In addition, the ALJ must build a bridge of logic connecting the evidence to the conclusions that support the decision. Groves v. Apfel, 148 F.3d 809, 811 (7th Cir. 1998). Because the Commissioner is responsible for weighing the evidence, resolving conflicts in the evidence, and making independent findings of fact, this Court may not decide the facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. Id. However, the Court does not defer to conclusions of law, and if the Commissioner makes an error of law or serious mistakes, reversal is required unless the Court is satisfied that no reasonable trier of fact could have come to a different conclusion. Sarchet v. Chater, 78 F.3d 305, 309 (7th Cir. 1996).

**The ALJ's Decision**

In his decision, the ALJ found that the Plaintiff had status-post lumbar surgery, peroneal nerve injury, degenerative disc disease, status-post arthroscopic surgery on the left knee, and depression, but that he had no impairment or combination of impairments that met or equaled the criteria of the Listing of Impairments (Tr. 25, 31-32).  The Plaintiff's complaints were not fully credible (Tr. 32).  The Plaintiff was unable to perform his past relevant work, but he retained the residual functional capacity to perform less than the full range of light work (Tr. 32).  The ALJ used the medical-vocational guidelines (grid), together with the testimony of the VE, to conclude that the Plaintiff was not disabled (Tr. 32).

The Plaintiff raises three issues in arguing that the decision of the Commissioner of Social Security's decision denying him benefits should be remanded for a new hearing.  Plaintiff states that at that new hearing, the ALJ should properly consider all of his conditions and resulting limitations.  In support of his demand, Plaintiff first argues that the hypothetical posed by the ALJ to the VE was incomplete.  Second, Plaintiff argues that the ALJ failed to consider all of his conditions in rendering a decision.  Last, Plaintiff argues that the ALJ's offered a boilerplate explanation of his finding that he (Plaintiff) was not credible.  This court is not persuaded and will discuss each argument in turn.

**The Hypothetical Posed by the ALJ**

ALJ posed a hypothetical question to the vocational expert that included: the ability to perform light work with a sit/stand option; no climbing ladders, ropes or scaffolding; occasionally climbing stairs and ramps; occasional stooping, kneeling, crouching and crawling; one or two step work processes; not at an assembly line pace; and no regular reading or writing

(T 402). In response, the VE testified that the hypothetical person could not perform any of Plaintiff's past work (T 402), satisfying Plaintiff's burden at step four of the sequential process. At step five, however, the VE identified a significant number of jobs the hypothetical individual could perform and based upon that opinion, the ALJ denied benefits (T 402-403).

In reviewing a decision of the ALJ on a claim for Social Security disability benefits, a court may not reweigh the evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute its own judgment for that of the Commissioner of the Social Security Administration; rather, the court's task is limited to determining whether the ALJ's factual finding is supported by substantial evidence. Young v. Barnhart, 363 F.3d 995, 1001 (7th Cir. 2004). In determining whether evidence is substantial, the standard is whether a reasonable person would accept it as adequate to support the conclusion. Id. With respect to the vocational experts opinion:

> Hypothetical questions posed to vocational experts ordinarily must include all limitations supported by medical evidence in the record. The reason for the rule is to ensure that the vocational expert does not refer to jobs that the applicant cannot work because the expert did not know the full range of the applicant's limitations. An exception therefore exists for cases in which the vocational expert independently learned of the limitations (through other questioning at the hearing or outside review of the medical records, for example) and presumably accounted for them.
>
> Steele v. Barnhart, 290 F.3d 936, 942 (7th Cir. 2002) (citations omitted).

Plaintiff argues that in the case at bar, the ALJ failed to include in his hypothetical to the VE the fact that Plaintiff has a limited range of motion in his lumbar spine, neck and shoulder. He further argues that he has had two back surgeries and still has moderate spinal stenosis (T 330), the latter fact never being assessed in the ALJ's decision.

The record reflects that the ALJ's hypothetical included limited motion of the lumbar spine when he included the limitations of lift and carry to 10 pounds frequently and 20 pounds occasionally, sitting and standing at an option, never climbing ladders, ropes, or scaffolding, and occasionally climbing ramps and stairs, stooping, kneeling, crouching and crawling (Tr. 402). These conditions took into consideration Plaintiff's problem with his back that included limited motion of the lumbar spine. With regard to Plaintiff's contention that the ALJ's hypothetical was incomplete because it did not mention limited motion of the neck and shoulder, the court notes that although the ALJ never included in his hypothetical question limited motion of the neck and shoulder, the VE was present at the hearing when the Plaintiff testified about substantial neck pain that radiated through his arms. (Tr. 388, 391, 399). In any event, the medical records filed as exhibits in this case do not support any restrictions for the Plaintiff as it regards his neck and shoulders.[1]

Plaintiff has undergone back surgeries, however, those procedures were performed along the lumbar spine at L4-5 and at L5-S1, and should have no impact on the Plaintiff's neck and shoulder (Tr. 187-92, 218-25). One examination by Dr. Leung in January 2001, showed only decreased abduction in the left shoulder with normal movement in all other planes, and only decreased rotation of the cervical spine or neck with essentially normal movement in all other planes (Tr. 286-87). In addition, Dr. Leung noted that the Plaintiff never even complained of neck or shoulder pain (Tr. 284-85). Significantly, a cervical MRI showed only some degenerative changes (Tr. 329). Based on the evidence of record, the ALJ reasonably did not

---

[1] Defendant maintains and the court could not locate in the medical records filed as exhibits any complaint by Plaintiff of neck and shoulder pain.

find limited motion of the neck and shoulder. The ALJ, therefore, properly did not include such limitations in his hypothetical question to the VE; however, the record is clear that the VE knew of those complaints through Plaintiff's testimony before the ALJ.[2]

Plaintiff also argues that the ALJ failed to take into account that work must be performed on a regular and continuing basis as required by the regulations. 20 CFR §404.1545(b).  He states that because he had surgery three times within a nine month period during 1999 (T 183, 187, 222), that the required hospitalizations, recovery time from three surgeries, and rehabilitation would have caused many days of absence from work during the time at issue.  He argues the ALJ should have included but did not include such absenteeism in the hypothetical and that employers will not tolerate more than two missed days of work per month.   To support that proposition he relies on Dixon v. Massanari, 270 F.3d 1171, 1179 (7th Cir. 2001).

Plaintiff's argument presumes that the ALJ should have accepted all of the testimony about his medical infirmities on their face and logically reasoned that he would have to miss work on a continuing basis.  However, the record is devoid of facts to support this argument.  The record demonstrates that Plaintiff had three surgeries.  He underwent arthroscopic surgery on his left knee on January 5, 1999, and had back procedures on May 18, 1999, and on September 2, 1999 (Tr. 183, 187-92, 218-25).  However, there is no evidence in the record that these procedures and rehabilitation persisted for any significant length of time.  Moreover, there is no evidence in the record that the Plaintiff would continually undergo procedures to the extent that such a limitation should be included in his residual functional capacity.  Indeed, such a

---

[2] Additionally, a letter, dated December 4, 2001, sent to the VE instructed him to review exhibits included with the case file and to base his testimony, in part, on the claimant's testimony (Tr. 63).

limitation has not lasted or could be expected to last for a continuous period of not less than twelve months.³ The ALJ, therefore, reasonably did not include a limitation of absenteeism in his hypothetical question to the VE.

**The ALJ's Consideration of all of the Plaintiff's Conditions**

The ALJ found that Plaintiff had the following medically determinable impairments: status post lumbar and left knee surgery; peroneal nerve injury; degenerative disc disease; and depression (T 31). The ALJ did not find that the Plaintiff's pain disorder, spinal stenosis, and scarring constituted medically determinable impairments. The Plaintiff's argument appears to be that these conditions caused the Plaintiff pain and that the ALJ failed to address them, thereby failing to address the Plaintiff's allegations of pain. This argument is without merit. In his order, the ALJ identified that the Plaintiff was diagnosed with spinal stenosis and further identified the nerve problems that the Plaintiff was suffering. However, the Plaintiff's reliance on Listing 1.04 is misplaced as he has identified no place in the record that would support a finding of part A, B, or C of the regulation. 20 C.F.R. 404, Subpt. P, App. 1, §1.04. With respect to the epidural scarring, the Plaintiff points to only one part of the record, a medical report dated August 6, 2001 (Tr. 331). It is unclear how this one report would render the ALJ's order erroneous. As the Defendant points out, remand on an issue should only be entertained if it might lead to a different result. Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989). The Plaintiff has offered no reasoning as to how this report would or could lead to a different conclusion.

---

³ However, the ALJ heard testimony from the Plaintiff about the nature of his claimed disability and found that testimony not credible. See discussion of credibility, infra.

**Credibility**

The Plaintiff finally makes a brief argument that the ALJ erred in finding that the Plaintiff's testimony concerning his limitations is not fully credible.  The Plaintiff implies that the ALJ based his credibility assessment only on the difference between the weight loss that the Plaintiff claimed and his actual weight loss.  Notwithstanding the ALJ's miscalculation, the ALJ did not merely rely on the issue of the Plaintiff's weight in making because the ALJ made an error in miscalculation.  A closer examination of the ALJ's order indicates that his credibility assessment was also based on the incongruity between the Plaintiff's allegations of pain and Dr. Gibb's, Dr. Lange's, and Dr. Wood's clinical findings (Tr. 26-27).  In addition, the ALJ noted that the Plaintiff's pain allegations were inconsistent with his ability to concentrate enough to read for 2 to 3 hours a day (Tr. 29).  There was no error in the ALJ finding that the Plaintiff's testimony was less than credible given the inconsistency with his activities and the findings of various doctors.  See White v. Barnhart, 415 F.3d 654, 659 (7th Cir. 2005).

## CONCLUSION

For the foregoing reasons, the Final Decision of the Commissioner denying benefits is **AFFIRMED** and this matter is **DISMISSED WITH PREJUDICE**.


**DATED: September 30, 2005**

        s/ Donald G. Wilkerson
        DONALD G. WILKERSON
        UNITED STATES MAGISTRATE JUDGE